ADA CIRINO VIZCARRONDO y OTROS, demandantes y recurridos, *v.* CLÍNICA GUBERN y OTROS, demandados y recurrentes.

*Número:* RE-87-31          *Resuelto:* 24 de febrero de 1992

*Gonzalo T. Barreras Varona,* de *Delgado Cadilla & Barreras Varona,* y *Olga M. Valentín Avilés,* abogados de los recurrentes; *Francisco Cuyar Fernández,* abogado de los recurridos.

## SENTENCIA

Expedimos auto de revisión con el propósito de evaluar la corrección jurídica de una sentencia del Tribunal Superior de Puerto Rico, Sala de Humacao, que declaró con lugar una demanda por alegada impericia médica que radicara ante dicho foro judicial la Sra. Ada Cirino Vizcarrondo y varios de sus familiares contra los doctores Raúl Justiniano y Manuel Pita Tovar, y el Hospital Gubern de Fajardo, Puerto Rico. Mediante la referida sentencia, el tribunal de instancia condenó a los mencionados codemandados a satisfacer, de manera solidaria, a la parte demandante la suma total de $101,850.00, las costas del

---

pleito y la cantidad de $5,000.00 por concepto de honorarios de abogado.

En el recurso de revisión que presentara, la parte demandada planteó que el foro de instancia cometió error:

1. ...al interpretar la evidencia médica ofrecida durante el juicio, resolviendo la controversia contrario a la prueba desfilada y a los principios básicos de la medicina.

2. ...al determinar que la causa de los daños de la señora Ada Cirino Vizcarrondo fue consecuencia del tratamiento, diagnóstico y/o la atención médica brindada por los doctores Manuel J. Pita Tovar y Raúl T. Justiniano.

3. ...al evaluar los daños de las demandantes en las altas cuantías determinadas.

4. ...al determinar mediante la imposición de honorarios de abogado e intereses legales, la temeridad por parte de un demandado al defender su posición en la controversia de autos. Solicitud de reconsideración, pág. 3.

A los fines de estar en mejor posición para evaluar los transcritos señalamientos de error ordenamos el 19 de octubre de 1990 la transcripción del testimonio de los peritos, tanto de la parte demandante como de la demandada, que declararon ante el foro de instancia. Estando en condiciones de resolver el recurso radicado, acometemos dicha encomienda.

I

Un examen juicioso y minucioso de todo el expediente —en especial, de la transcripción de las declaraciones de todos los testigos peritos— nos convence del hecho de que los doctores codemandados le brindaron a la codemandante Cirino Vizcarrondo una atención médica y un tratamiento que, a la luz de los modernos medios de comunicación y enseñanza, satisfizo las exigencias reconocidas por la profesión médica para la fecha de la ocurrencia de los hechos que dieron lugar al recurso ante nuestra consideración. *Oliveros v. Abréu,* 101 D.P.R. 209 (1973). *A*

*lo sumo*, y en lo referente a los médicos codemandados, nos enfrentamos a un caso de un error de juicio, honesto e informado, de parte de los mismos, el cual no origina responsabilidad. *Ríos Ruiz v. Mark*, 119 D.P.R. 816 (1987).

En cuanto al codemandado Hospital Gubern, tenemos que es correcto que el personal del referido hospital no siguió al pie de la letra las órdenes médicas que, respecto a la paciente Cirino Vizcarrondo, dispensaron los doctores Justiniano y Pita Tovar; omisión que puede generar responsabilidad. *Núñez v. Cintrón*, 115 D.P.R. 598 (1984). Existe, sin embargo, un obstáculo para así concluirlo en el presente caso. El mismo consiste en la ausencia de relación causal entre dicha omisión y el alegado daño experimentado por la codemandante Cirino Vizcarrondo. *Medina Santiago v. Vélez*, 120 D.P.R. 380 (1988).

Por los fundamentos expresados, *resulta inevitable la revocación de la sentencia impositiva de responsabilidad emitida por el Tribunal Superior de Puerto Rico, Sala de Humacao, en el presente caso.*

Así lo pronunció y manda el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Rebollo López emitió una opinión concurrente. El Juez Asociado Señor Negrón García emitió una opinión disidente.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

— O —

Opinión concurrente emitida por el Juez Asociado Señor Rebollo López.

Evaluamos, en primer lugar, la corrección jurídica de una sentencia emitida por el Tribunal Superior de Puerto Rico, Sala de Humacao, mediante la cual dicho foro declaró *con lugar una demanda de daños y perjuicios, por alegada*

*impericia médica*, radicada por la Sra. Ada Cirino Vizcarrondo, y sus familiares, contra dos facultativos médicos —el ginecólogo obstetra Manuel Pita Tovar y el cirujano Raúl Justiniano— y una institución hospitalaria, el Hospital Gubern, localizada la misma en Fajardo, Puerto Rico. Mediante la referida sentencia, el tribunal de instancia condenó a "la parte demandada a pagar solidariamente a la parte demandante la suma total de $106,850.00", las costas, más una suma adicional de cinco mil dólares por concepto de honorarios de abogado. Apéndice, págs. 47–48.

En segundo término, el recurso radicado nos brinda *la oportunidad de expresarnos* en cuanto a la problemática en general existente en nuestra jurisdicción referente a la radicación de acciones por alegada impericia médica; la dificultad de la ciudadanía en conseguir testimonio pericial competente en esta clase de casos, y la actitud y acción que, a nuestra manera de ver las cosas, deben asumir, y tomar, al respecto la clase médica, la togada y los tribunales de justicia. *Ahí el porqué de nuestra opinión concurrente.*

I

La codemandante Ada Cirino Vizcarrondo —quien había sido paciente del obstetra Pita Tovar en relación con el nacimiento de su primer hijo, alumbramiento que culminó en una operación cesárea— ingresó en el Hospital Gubern el 1ro de octubre de 1980 con el propósito de someterse a una segunda operación cesárea, intervención quirúrgica que estaba programada para el día siguiente, es decir, el 2 de octubre de 1980. El curso pre natal, bajo la supervisión del doctor Pita Tovar, fue uno normal. Merece destacarse, *sin embargo*, que la señora Cirino Vizcarrondo, quien es una persona que padece de un serio problema de control de peso —*condición conocida como "obesidad mórbida"*— pe-

saba doscientas sesenta y ocho libras para la fecha de su segundo alumbramiento.[1]

Habiendo dado a luz a una niña el 2 de octubre de 1980, y luego de un período de recuperación de cuatro días sin problema de clase alguna, la señora Cirino Vizcarrondo fue dada de alta del Hospital Gubern el 6 de octubre por el doctor Pita Tovar con instrucciones de que regresara tres días más tarde con el propósito de removerle los puntos de sutura de la cesárea realizada. Así lo hizo la referida paciente, informándole a su doctor que durante el mencionado período no había padecido de problema alguno. Al otro día, sin embargo, la señora Cirino Vizcarrondo se personó a la oficina del doctor Pita Tovar por razón de que supuraba por uno de los "puntos" de sutura ya removidos. El doctor Pita Tovar le drenó el absceso que se había desarrollado, recetándole un antibiótico y un antiinflamatorio. La paciente fue enviada a su hogar con instrucciones de regresar de no mejorar la situación.

En la madrugada del *16 de octubre*, la señora Cirino Vizcarrondo se vió afectada por un dolor agudo en el "epigastrio" —esto es, en el área del abdomen alto— y alguna fiebre. La paciente se personó al Hospital Gubern, donde fue ingresada por orden del doctor Pita Tovar, a eso de las 10:15 de la mañana, " 'para tratamiento y observación' ". Apéndice, pág. 25.

Ante el cuadro que presentaba la paciente, el doctor Pita Tovar entendió procedente "consultar" con un cirujano, el Dr. Raúl Justiniano, lo cual hizo pasadas las doce del mediodía del 16 de octubre. El doctor Justiniano, no obstante tener un viaje fuera de Puerto Rico señalado para el siguiente día, aceptó ver la paciente en consulta. Se ordenaron unos análisis de laboratorio. Los mismos demos-

---

[1] Conforme surge de la sentencia dictada por el foro de instancia, la señora Cirino Vizcarrondo pesaba doscientas noventa libras al momento de celebrarse la vista en su fondo del presente caso; *ella tiene una estatura de 5'2".*

traron que "las *amilasas séricas* estaban *ligeramente elevadas* ... y que los *glóbulos blancos no mostraban señales de infección* ...". (Énfasis suplido.)[2]

El doctor Justiniano concluyó que la condición de la paciente Cirino Vizcarrondo *podía deberse a una de cinco causas, a saber:* colecistitis, apendicitis, pancreatitis, abscesos intraabdominales o embolismo pulmonar. Entendió, y así lo diagnosticó, que lo más probable era que la paciente padeciera de "pancreatitis", procediendo a brindársele a la paciente tratamiento para dicha alegada condición. Posteriormente el doctor Justiniano llegó a la conclusión, hecho que le comunicó al doctor Pita Tovar, que "tomando en consideración *los posibles diagnósticos* a ser descartados y *las facilidades* del Hospital Gubern, y *la condición* de la Sra. Cirino, ... *era necesario trasladar a dicha señora, a un hospital que tuviera facilidades adecuadas*". (Énfasis suplido.)[3]

Conforme determinara el tribunal de instancia en la sentencia que emitiera:[4]

> ... El Hospital Gubern no contaba para 1980 (*ni tampoco los demás hospitales de Fajardo*) con una Sala de Cuidado Intensivo ni con el personal necesario para operarla, *donde Ada hubiera podido ser recluída si se le intervenía quirúrgicamente y surgía algún tipo de complicación causada principalmente por su obesidad.* Tampoco había en el área de Fajardo para 1980 una máquina para hacer sonografías y de esa forma hacerle un estudio diagnóstico a Ada para conocer exactamente lo que le aquejaba. *Con esas facilidades disponibles el problema de la Sra. Cirino se hubiera resuelto más satisfactoriamente.* (Énfasis suplido.)

Informados de dicha situación, los familiares de la paciente Cirino Vizcarrondo solicitaron el traslado de ésta. El doctor Pita Tovar se comunicó por la vía telefónica con dos

---

[2] Apéndice, pág. 28.

[3] Apéndice, pág. 29.

[4] Apéndice, pág. 31.

hospitales del área metropolitana de San Juan, a saber: Hospital Auxilio Mutuo y el Doctor's Hospital. *Los familiares de la paciente seleccionaron el Doctor's Hospital.* La paciente fue trasladada, entre 6:00 y 6:30 P.M. del 17 de octubre, a la referida institución hospitalaria en *ambulancia privada* acompañada únicamente por su señora madre; esto es, no las acompañó facultativo médico o personal paramédico alguno. El viaje en ambulancia fue realizado aproximadamente en una hora. Al llegar la paciente al Doctor's Hospital, ésta se encontraba, *aparentemente*, en estado de "shock".[5] Allí fue atendida brevemente por un facultativo médico quien, luego de únicamente tomarle los signos vitales, se negó a ingresarla, recomendando que fuera trasladada al Centro Médico.

La señora Cirino Vizcarrondo llegó al referido Centro entre las 10:00 y las 12:00 de la noche del día 17 de octubre de 1980. A su llegada, conforme los récord médicos de dicha institución, la paciente sufría de "shock séptico" y tenía dificultades para respirar, siendo colocada en un respirador mecánico. Su caso *fue objeto de consulta* por varios especialistas y departamentos del Centro Médico. *Al cabo de cuatro. días*, la señora Cirino Vizcarrondo fue sometida a una "laparotomía exploratoria",[6] *recuperándose totalmente de la condición que le aquejaba*, siendo dada de alta de dicha institución hospitalaria el 26 de noviembre de 1980.

El Dr. Rehuel Rivera —quien para el 21 de octubre de 1980 se desempeñaba como *residente de primer año de cirugía* en el Centro Médico; quien *participó* en la "laparotomía exploratoria" que se le practicara allí a la señora Cirino Vizcarrondo, y quien testificó como perito de la parte demandante— declaró que el *diagnóstico final*, luego de la operación, fue de abscesos intraabdominales; causada di-

---

[5] Apéndice, pág. 33.
[6] Apéndice, pág. 34.

cha condición, *posiblemente y en su opinión*, debido a un trauma que envolvió el "epiplón u omentum" cuando se realizó la cesárea, trauma que ocasionó un absceso en el "omentum", el cual rompió, diseminándose su contenido dentro del abdomen, formándose múltiples abscesos en el mismo,([7]) *opinión que acogió el foro de instancia.*

Procede que se señale, por último, que el tribunal de instancia específicamente dilucidó una controversia surgida entre los diferentes peritos presentados por las partes acerca del hecho de si la paciente Ada Cirino debió o no ser operada mientras estuvo hospitalizada, por un período aproximado de treinta horas, en el Hospital Gubern durante los días 16 y 17 de octubre de 1980. Dicho foro judicial aceptó —y así específicamente lo concluyó— la opinión de los peritos presentados por la parte demandada a los efectos de que, conforme "la mejor práctica de la medicina moderna", *no* era aconsejable *ni* indicado intervenir quirúrgicamente a la paciente durante el período de tiempo que ésta estuvo recluida en el Hospital Gubern; ello por razón de que el médico debe tratar de resolver clínicamente la condición que aqueja a un paciente mientras ello sea posible y que la decisión de intervenir quirúrgicamente a éste debe ser el último recurso, decisión producto de un diagnóstico que así lo indique.([8])

Ello no obstante, y como indicáramos al comienzo, el tribunal de instancia entendió que *ambos* doctores, *así como* el hospital demandado, habían incurrido en "mala práctica de la medicina". Específicamente en cuanto al ginecólogo Pita Tovar, dicho foro concluyó que el haber "ocasionado [el] trauma en el epiplón u omentum durante la operación cesárea fue una mala práctica de la medicina por parte [de éste]"; actuación negligente que, conforme el tribunal de instancia, fue la causa del "v[í]a-crucis por el que

---

([7]) T.E. de 11 de febrero de 1986, págs. 36–38.

([8]) Apéndice, pág. 30.

atravesó la demandante Ada Cirino, así como sus familiares". Apéndice, págs. 35–36. En adición, entendió el foro de instancia, y así lo resolvió, que tanto el doctor Pita Tovar, como el doctor Justiniano, fueron negligentes en el tratamiento médico en general que le brindaron a la señora Cirino Vizcarrondo, en específico: al errar en su diagnóstico de "pancreatitis", el cual era uno de "fácil eliminación"; al no realizar exámenes adicionales con el propósito de precisar más los diagnósticos emitidos; al no trasladar a la paciente a otro hospital con mayor prontitud; al no disponer para que el traslado de la paciente a otro hospital se hiciera en condiciones más favorables, y al no cerciorarse que el personal del Hospital Gubern siguiera sus instrucciones médicas respecto a la toma de signos vitales. En cuanto al Hospital Gubern, un examen de la sentencia emitida revela que el foro de instancia determinó, como causa *única* de negligencia por parte de dicha institución, que el personal de dicho hospital no siguió al pie de la letra las órdenes de los doctores Pita Tovar y Justiniano respecto a la toma de los signos vitales de la paciente Cirino Vizcarrondo.

Inconformes con la sentencia dictada por el tribunal de instancia, tanto los doctores Pita Tovar y Justiniano como el Hospital Gubern acudieron, vía la radicación del correspondiente recurso de revisión, ante este Tribunal. En el mismo, le imputaron al foro de instancia haber errado:

1. ...al interpretar la evidencia médica ofrecida durante el juicio, resolviendo la controversia contrario a la prueba desfilada y a los principios básicos de la medicina.
2. ...al determinar que la causa de los daños de la señora Ada Cirino Vizcarrondo fue consecuencia del tratamiento, diagnóstico y/o la atención médica brindada por los doctores Manuel J. Pita Tovar y Raúl T. Justiniano.
3. ...al evaluar los daños de las demandantes en las altas cuantías determinadas.
4. ...al determinar mediante la imposición de honorarios de abogado e intereses legales, la temeridad por parte de un de-

mandado al defender su posición en la controversia de autos. Solicitud de reconsideración, pág. 3.

Expedimos el auto de revisión solicitado. Mediante Resolución de fecha 19 de octubre de 1990 ordenamos la transcripción de los testimonios prestados por *todos* los peritos médicos que testificaron ante el foro de instancia.

## II

En *Pérez Torres v. Bladuell Ramos*, 120 D.P.R. 295, 297–298 (1988), expresamos, en lo pertinente, que:

> Las acciones por alegada impericia médica constituyen o representan un reto especial para los jueces. *Dichos casos siempre versan sobre la ocurrencia de un daño; uno que, por lo general, resulta impresionante y doloroso.* No obstante el natural sentimiento de compasión que todo ser humano experimenta al enfrentarse al daño y sufrimiento de otro ser humano, los jueces tenemos que mantener siempre presente *que el mero hecho de que haya ocurrido un daño no significa que el médico es civilmente responsable por el mismo.* En otras palabras, no podemos darnos el lujo de que nuestros sentimientos dominen nuestro discernimiento. De así permitirlo, estaríamos incumpliendo con nuestra función como jueces. (Énfasis suplido.)

Como es igualmente sabido, en *Oliveros v. Abréu*, 101 D.P.R. 209, 226 (1973), establecimos la norma a ser utilizada en nuestra jurisdicción para determinar la responsabilidad de los médicos en casos de alegada mala práctica profesional. La referida norma le impone a éstos la obligación de ofrecer a sus pacientes aquella atención médica que a la luz de los modernos medios de comunicación y enseñanza, satisfaga las exigencias generalmente reconocidas por la propia profesión médica. *Pérez Torres v. Bladuell Ramos*, ante; *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639 (1988); *Ríos Ruiz v. Mark*, 119 D.P.R. 816 (1987); *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719 (1983), entre otros.

En el citado caso de *Oliveros v. Abréu, revocamos* la norma que habíamos establecido en *Rivera v. Dunscombe,*

73 D.P.R. 819, 838 (1952), a los efectos de que un médico sólo viene obligado a dar a sus pacientes aquella atención médica que generalmente se emplea para casos similares por el resto de los médicos en la comunidad. *La diferencia entre ambas normas es obvia.* Bajo la doctrina establecida en *Oliveros v. Abréu*, ante —en pleno vigor hoy día— un médico no queda exonerado de responsabilidad, en un caso de impericia médica, por el mero hecho de que le haya brindado a su paciente la atención médica que ordinaria y usualmente proveen sus colegas en la misma comunidad o "plaza" en que el médico se desenvuelve si esa atención no satisface las exigencias de la profesión médica en general a la luz de los modernos medios de comunicación y enseñanza. *En otras palabras, independientemente del lugar específico donde ejerza su profesión, el médico en nuestro País viene siempre en la obligación de brindar a sus pacientes la mejor atención médica de acuerdo con los últimos métodos y procedimientos de la medicina moderna de que él pueda tener conocimiento.* Véase *Pérez Torres v. Bladuell Ramos*, ante.

No obstante, *al facultativo médico se le reconoce una amplia discreción en el cuidado de un paciente.* En ese sentido, hemos resuelto que un médico *no* "incurre en responsabilidad si el tratamiento que le brinda a su paciente, aun cuando erróneo, está enmarcado en los linderos de lo razonable y es aceptado por amplios sectores de la profesión médica; *constituyendo defensa válida* para el médico demandado la existencia de divergencia de criterios entre las autoridades médicas sobre si el tratamiento o procedimiento en particular era correcto bajo las circunstancias del caso". (Énfasis suplido.) *Pérez Torres v. Bladuell Ramos*, ante, págs. 303–304, citando con aprobación a *Lozada v. E.L.A.*, 116 D.P.R. 202, 217 (1985); *Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721 (1984), y a *Fernández v. Hosp. Gen. San Carlos, Inc.*, 113 D.P.R. 761 (1983). En palabras sencillas, el error de juicio —*honesto e informado*—

cometido por un médico en el tratamiento de su paciente *no* constituye fuente de responsabilidad. *Pérez Torres v. Bladuell Ramos*, ante; *Ríos Ruiz v. Mark*, ante.

Por otro lado, no debe olvidarse que en casos de alegada impericia médica la parte demandante viene en la obligación de probar mediante *preponderancia de la prueba* que el tratamiento ofrecido por el demandado, o la ausencia de proveer el tratamiento indicado y correcto, fue el factor que *con mayor probabilidad* ocasionó el daño sufrido por el paciente. *Rodríguez Crespo v. Hernández*, ante, págs. 649–650; *Cruz v. Centro Médico de P.R.*, ante, pág. 744; *Zambrana v. Hospital Santo Asilo de Damas*, 109 D.P.R. 517, 521 (1980). Ello es así, toda vez que en estos casos existe *una presunción* de que el médico le brindó un tratamiento adecuado a su paciente, lo que le impone al demandante la obligación de *rebatir* dicha presunción a través de la presentación de prueba suficiente en contrario. *Rodríguez Crespo v. Hernández*, ante. En otras palabras, la parte demandante tiene que probar que el tratamiento suministrado por el demandado no fue el adecuado. Véase *Rosado Rosado v. E.L.A.*, 108 D.P.R. 789, 792 (1979).

Asimismo, hemos señalado que para que se entienda establecido un caso, prima facie, de daños y perjuicios por alegada mala práctica de la medicina es necesario que el demandante presente prueba satisfactoria sobre "(1)... las normas mínimas de conocimiento y cuidado médico aplicables a los generalistas o a los especialistas, y (2) la *relación causal* entre la actuación u omisión del facultativo y la lesión sufrida por el paciente. *Medina Santiago v. Vélez*, 120 D.P.R. 380, 385 (1988). Es conveniente recordar que al momento de ejercer nuestra función revisora, en casos como el de epígrafe, nuestra decisión debe fundarse, en lo posible, en aquella prueba pericial y documental *que haya sido presentada* ante el foro de instancia. *Ríos Ruiz v. Mark*, ante. En relación con lo antes expresado, resulta procedente enfatizar que en aquellos casos en que exista

un conflicto en relación con la prueba pericial desfilada, hemos establecido que este Tribunal, al igual que el foro de instancia, podrá optar por aquella posición que le "merezca más crédito". *Zambrana v. Hospital Santo Asilo de Damas*, ante; *Prieto v. Maryland Casualty Co.*, 98 D.P.R. 594 (1970), y *Pereira v. E.L.A.*, 91 D.P.R. 750 (1965).

Por último, dados los hechos particulares del caso ante nuestra consideración, conviene recordar que puede constituir fuente de responsabilidad extracontractual para una institución hospitalaria el hecho de que su personal no cumpla con las instrucciones que, respecto a los pacientes hospitalizados en la misma, impartan los facultativos médicos que atienden a dichos pacientes. *Núñez v. Cintrón*, 115 D.P.R. 598 (1984).

Manteniendo presente toda la normativa antes expuesta, pasamos a examinar la controversia planteada en el caso de epígrafe.

## III

Analizamos, en primer término, los fundamentos que esgrimiera el tribunal de instancia en apoyo de la sentencia que emitiera, en específico, del dictamen a los efectos de que tanto los doctores Justiniano y Pita Tovar, como el Hospital Gubern, incurrieron en actos de impericia médica.

A. Como expresáramos anteriormente, el referido foro específicamente determinó que el obstetra Pita Tovar incurrió en "mala práctica de la medicina" al negligentemente traumatizar —esto es, suturar— el "omentum o epiplón" de la señora Cirino Vizcarrondo durante la operación cesárea que le realizó; "actuación negligente" que, conforme el tribunal de instancia, fue la causa de los abscesos intraabdominales que posteriormente desarrolló la mencionada paciente.

Al igual que la mayoría del Tribunal, *diferimos*. Como es sabido, el "omento o epiplón" —también conocido como "redaño o mesenterio"— no es otra cosa que el repliegue del peritoneo, esto es, el tejido que une el estómago y los intestinos con las paredes abdominales. En palabras del doctor Rivera, perito en cirugía presentado por la parte demandante, el "omento" no es otra cosa que "una capa como de grasa que cubre el abdomen ...".(⁹)

Un examen del testimonio prestado por el doctor Rivera, uno de los dos peritos presentados por la parte demandante, revela que éste *nunca* testificó que suturar el "omento" constituya impericia médica de un cirujano. Por su parte, el Dr. Amaury Capella —quien testificó como perito de la parte demandada— declaró que ello no sólo no constituye negligencia por parte del médico sino "que a veces a propósito cogemos suturas en el epiplón, el omento".(¹⁰)

Ello no obstante, procede que nos preguntemos si en el presente caso la prueba presentada efectivamente demostró que el obstetra Pita Tovar suturó el "omento" de la señora Cirino Vizcarrondo. La evidencia *que tiende a así sugerirlo* surge, como expresáramos anteriormente, del testimonio que prestara el doctor Rivera.(¹¹) Dicho testimonio, sin embargo, *no* es uno concluyente a esos efectos; el propio doctor Rivera lo cataloga como una mera "posibilidad".(¹²)

---

(⁹) T.E. de 11 de febrero de 1986, pág. 37.

(¹⁰) T.E. de 14 de febrero de 1986, pág. 41.

(¹¹) Conforme surge del propio testimonio del doctor Rivera, él realizó sus estudios de medicina en la Universidad Autónoma de Guadalajara, Méjico, y su residencia en cirugía en el Centro Médico de Puerto Rico. T.E. de 11 de febrero de 1986, pág. 3.

Resulta procedente que se señale, en adición, que para la fecha de la vista en su fondo del presente caso a nivel de instancia, *el doctor Rivera tenía establecida una sociedad profesional con el hermano del abogado de la parte demandante.* T.E. de 11 de febrero de 1986, págs. 3–4.

(¹²) "P Doctor, viendo retroactivamente después de la operación, usted podría decirme dónde se originó el problema intraabdominal de esta paciente, viéndolo retroactivamente?

Por último tenemos que, aun partiendo de la premisa que en el presente caso el doctor Pita Tovar efectivamente suturara el "omento" de la señora Cirino Vizcarrondo, el balance más racional, justiciero y jurídico de la evidencia pericial presentada a nivel de instancia *no* sostiene la conclusión de que dicha sutura fuera *la causa* de los abscesos intraabdominales que desarrollara la mencionada paciente. Frente a la "mera posibilidad" de que ello así fuera, sugerida por el doctor Rivera, nos enfrentamos al testimonio *claro y categórico en contrario* de los dos peritos presentados por la parte demandada, el cirujano Amaury Capella y el ginecólogo obstetra Fernando Montilla, profesionales de reconocida e indudable capacidad en sus respectivos campos de la medicina en Puerto Rico. Estos expresaron la opinión de que la "traumatización", o sutura, del "omento" *nunca* puede ser, per se, la causa de una infección en el abdomen deunapersona.(13) En adición a señalar que en toda inter vención quirúrgica existe la posibilidad, *sin que haya negligencia alguna,* de que se desarrollen infecciones, la opinión del doctor Capella fue a los efectos de que en el presente caso lo sucedido se debió al hecho de que se trataba de una paciente "sumamente obesa" que es sometida a una operación cesárea y esterilización, en la

"R *Parecía surgir* por una u otra razón, en el último hallazgo que el doctor Alcaraz mencionó, como si por una u otra razón se hubiese formado un absceso en el omento y eso hubiese roto por una u otra razón y se hubiese diseminado dentro del abdomen y esa hubiera sido la causa que se hubiesen formado los múltiples abscesos y la pus libre en la barriga. Esa es *la impresión* de aquellos que estuvimos en la operación, en ese caso en específico.

"P Doctor, ¿cabe la posibilidad que lo que haya desatado la secuencia.en este evento que terminó en una catástrofe abdominal pueda haber sido ocasionado por un trauma técnico en el corregimiento procedimiento quirúrgico que se le hizo con la cesárea en el omento, pudo ser?

"R Eso, yo no estuve en esa operación original, *eso es una posibilidad.*

"P ¿*Eso es una posibilidad, doctor?*

"R *Eso es una posibilidad.*" (Énfasis suplido.) T.E. de 11 de febrero de 1986, págs. 37 y 38.

(13) T.E. de 14 de febrero de 1986, págs. 40, 41 y 45, y T.E. de 4 de abril de 1986, págs. 33 y 36.

cual "sabemos que puede haber bacteria que pasan del medio ambiente a través de la matriz y de las trompas hacia la ca[v]idad abdominal"; esto es, debido a complicaciones que no hay manera de evitar.([14])

En resumen, tenemos que un análisis cuidadoso de la prueba pericial —de ambas partes— que desfilara ante el tribunal de instancia *no sostiene* la posición o determinación del tribunal de instancia a los efectos de que el suturar el "omento o epiplón" durante una intervención quirúrgica constituya, per se, impericia médica por parte del facultativo médico que realiza una intervención quirúrgica como la aquí en controversia. Tenemos, *por otro lado*, que la prueba presentada por la parte demandante con el propósito de demostrar que ello así ocurrió en el presente caso —por voz del Dr. Rehuel Rivera— *es una no concluyente.* Por último, aun asumiendo a los fines de la argumentación de que efectivamente el doctor Pita Tovar suturó el "omento o epiplón" de la señora Cirino Vizcarrondo durante la operación cesárea que efectuara, la determinación del tribunal de instancia a los efectos de que dicha sutura fue la causa de que la paciente posteriormente desarrollara abscesos intra-abdominales *no* representa el balance más racional, justiciero y jurídico de la totalidad de la evidencia pericial que desfilara ante el tribunal de instancia. *Ramos Acosta v. Caparra Dairy, Inc.*, 113 D.P.R. 357, 364 (1982); *Sanabria v. Sucn. González*, 82 D.P.R. 885 (1961).

B. Erró, igualmente, el tribunal de instancia al determinar, a base de la prueba pericial que le fuera presentada, que los doctores Pita Tovar y Justiniano incurrieron en "mala práctica de la medicina" al errar en su diagnóstico de "pancreatitis", el cual alegadamente era de fácil eliminación, y al no realizar exámenes adicionales con el propósito de precisar más el mismo.

---

([14]) T.E. de 14 de febrero de 1986, págs. 11, 42 y 43.

Como surge de la relación que de los hechos hiciéramos al comienzo de la presente ponencia, el doctor Justiniano fue de la opinión que la condición de la paciente Cirino Vizcarrondo podía deberse a una de cinco causas, a saber: colecistitis, apendicitis, *pancreatitis, abscesos intraabdominales* o embolismo pulmonar. Su diagnóstico, sin embargo, fue a los efectos de que la señora Cirino Vizcarrondo con toda probabilidad padecía de "pancreatitis", procediendo los doctores Justiniano y Pita Tovar a tratarla conforme al mismo; diagnóstico que, como hemos visto, encontraba apoyo en la sintomatología que presentaba la paciente y en los resultados de los laboratorios realizados.

¿Significa el error cometido en el diagnóstico que los referidos facultativos médicos incurrieron en "mala práctica de la medicina"? *Definitivamente no.* Como es sabido, ningún médico debe ser responsabilizado por un error de juicio —honesto e informado— cometido en el tratamiento de un paciente. *Ríos Ruiz v. Mark,* ante. El diagnóstico, y tratamiento de "pancreatitis" de que fuera objeto la señora Cirino Vizcarrondo de parte de los doctores Justiniano y Pita Tovar fue uno, dadas las circunstancias específicas del caso, "enmarcado en los linderos de lo razonable ...". *Pérez Torres v. Bladuell Ramos,* ante, pág. 304. La *mejor evidencia* de ello lo constituye el hecho de que el propio perito de la parte demandante, Dr. Rehuel Rivera, *aceptó* que ante los hechos, y síntomas, que presentaba el *16 de octubre de 1980* la señora Cirino Vizcarrondo —esto es, al ser ingresada en el Hospital Gubern— su diagnóstico hubiera sido, *igualmente,* el de "pancreatitis";[15] que al momento de llegar la mencionada paciente al Centro Médico los posibles diagnósticos que allí se hicieron *coincidían* con los realizados por el doctor Justiniano,[16] y que aun para la fecha en que se le practicó a la referida paciente la "laparotomía

---

[15] T.E. de 11 de febrero de 1986, pág. 94.

[16] Íd., págs. 56 y 57.

exploratoria" en el Centro Médico —esto es, el 21 de octubre de 1980— dicho diagnóstico *continuaba latente* ya que los médicos de dicha institución hospitalaria no tenían, a pesar de los exámenes y evaluaciones realizadas, un "diagnóstico exacto".[17] En palabras del doctor Capella, el hecho de que el 21 de octubre los médicos del Centro Médico decidieran realizar una "laparotomía exploratoria" significa que aún para esa fecha "no sabían lo que tenía" la paciente.[18]

C. Erró, adicionalmente, el tribunal de instancia al concluir que los doctores Justiniano y Pita Tovar incurrieron en actos de impericia médica al no trasladar a la paciente a otro hospital con mayor prontitud y al no disponer para que el traslado finalmente realizado se hiciera en condiciones más favorables.

Dicho foro, al así concluir, inadvertidamente pasó por alto el hecho de que, habiéndose realizado por los doctores Justiniano y Pita Tovar un diagnóstico honesto e informado —aun cuando erróneo— de que la señora Cirino Vizcarrondo sufría de "pancreatitis", el tratamiento médico que éstos ordenaron, y le brindaron, a su paciente durante las primeras veinticuatro horas *fue el indicado para esta clase de situaciones*. En ello *coinciden* tanto el doctor Rivera como el doctor Capella;[19] esto es, un tratamiento consistente, mayormente, en descanso, suero, y "nada por boca".[20] En relación a ello, conviene recordar que el tribunal de instancia específicamente determinó que conforme a

---

[17] Íd., págs. 10, 11, 83, 84 y 92.

[18] T.E. de 14 de febrero de 1986, págs. 36 y 37.

[19] T.E. de 11 de febrero de 1986, págs. 34 y 86, y T.E. de 14 de febrero de 1986, pág. 30.

[20] Como informamos al comienzo de la ponencia, en vista al testimonio prestado en este respecto por los doctores Rivera y Capella, el tribunal de instancia rechazó la opinión pericial contraria brindada por un segundo perito presentado por la parte demandante, el ginecólogo obstetra dominicano Luis Baldera Quezada, quien declaró que él hubiera operado inmediatamente a la paciente Cirino Vizcarrondo.

la "mejor práctica de la medicina" un médico debe tratar de resolver clínicamente la condición que aqueja a su paciente antes de proceder a someter a éste a una intervención quirúrgica, la cual debe ser el último recurso.

Siendo ello así, resulta completamente contradictoria la determinación del foro de instancia de que se incurrió en mala práctica de la medicina al no ordenar el traslado de la paciente con mayor prontitud. En vista del diagnóstico de "pancreatitis", resultaba procedente que se esperase un período de tiempo razonable con el objetivo de que la paciente respondiera al tratamiento para dicha condición antes de considerar la alternativa de intervenirla quirúrgicamente, alternativa para la cual resultaba médicamente aconsejable trasladarla a un hospital de San Juan.

Ahora bien, pasadas las primeras veinticuatro horas sin que la paciente mejorara, y en vista de que ésta, *debido a su extrema obesidad*, representaba un caso en que podrían necesitarse, de ser necesaria la cirugía, *facilidades con las que no se contaba en el pueblo de Fajardo*, los doctores Justiniano y Pita Tovar recomendaron que se trasladara la paciente a un hospital del área metropolitana de San Juan que contara con dichas facilidades. *Ello era lo aconsejable desde el punto de vista de la práctica de excelencia de la medicina.* Así, inclusive, lo aceptó el propio perito de la parte demandante, el Dr. Rehuel Rivera.([21])

En lo referente a dicha alternativa, el tribunal de instancia, como hemos visto, determinó que los doctores Justiniano y Pita Tovar incurrieron en negligencia médica que los hace civilmente responsables al permitir que la señora Cirino Vizcarrondo fuera trasladada en ambulancia en condiciones "desfavorables", esto es, únicamente acompañada por su señora madre. Somos los primeros en aceptar que posiblemente la paciente Cirino Vizcarrondo hubiera tenido un viaje más tranquilo y agradable de haber estado

---

([21]) T.E. de 11 de febrero de 1986, págs. 87 y 88.

acompañada en el mismo por personal médico o paramédico.

Ello, sin embargo, no resulta ser suficiente en derecho para responsabilizar a los doctores demandados. Ante los hechos específicos del caso —en especial, en vista de la obvia necesidad de que se trasladara la paciente a San Juan— nuestra función nos impone la obligación de cuestionarnos si la acción de los doctores demandados al autorizar que el viaje se realizara bajo las condiciones que se llevó a cabo, fue el factor que con *mayor probabilidad* ocasionó el daño o condición sufrida por la referida persona (*Rodríguez Crespo v. Hernández*, ante), esto es, si existe *relación causal* entre dicha acción y la lesión o daño sufrido por la paciente. *Medina Santiago v. Vélez*, ante.

La contestación a dicha interrogante, *en la negativa*, la brindó el propio perito presentado por la parte demandante, el Dr. Rehuel Rivera. Dicho testigo declaró que la "condición de la paciente no hubiese variado mucho a menos que se operara".([22]) En otras palabras, conforme el perito Rivera, el hecho de que el viaje en ambulancia se hiciera bajo las condiciones descritas por el tribunal de instancia en nada afectó la condición principal de que sufría la señora Cirino Vizcarrondo.

D. Dicho razonamiento —esto es, el de ausencia de relación causal— derrota, igualmente, las determinaciones del foro de instancia a los efectos de que constituyó "mala práctica de la medicina" de parte del Hospital Gubern el hecho de que sus empleados no siguieran las órdenes de los doctores Justiniano y Pita Tovar sobre la toma de los signos vitales de la paciente así como que igualmente incurrieron en actos de impericia médica los referidos galenos al no supervisar adecuadamente sus órdenes a esos efectos. Independientemente del hecho que dicha omisión

---

([22]) Íd., págs. 90 y 91.

puede constituir, *en casos apropiados*, negligencia médica (*Núñez v. Cintrón*, ante), en el presente caso *no* existe prueba en el récord que demuestre relación causal alguna entre esos hechos y la condición o daño sufrido por la paciente Cirino Vizcarrondo. *Medina Santiago v. Vélez*, ante.

E. Como podemos notar —y no obstante el hecho de que resulta indiscutible que la señora Cirino Vizcarrondo, y sus familiares, sufrieron daños palpables como consecuencia de la condición que ésta desarrolló luego de la operación cesárea a la que fuera sometida— *la sentencia emitida por el foro de instancia en el presente caso no puede prevalecer.*

La prueba presentada *no* demuestra que los doctores Pita Tovar y Justiniano incurrieran en negligencia médica por la cual deban civilmente responderle a la parte demandante; ello por razón de que el tratamiento médico que los referidos galenos le brindaron a la señora Cirino Vizcarrondo estuvo enmarcado dentro de los linderos, o parámetros, de lo razonable y aceptable por la profesión médica en Puerto Rico. *Pérez Torres v. Bladuell Ramos*, ante.

En lo que respecta al Hospital Gubern, la prueba presentada no demostró el *nexo causal* requerido entre la omisión en que incurrió el personal de dicha institución hospitalaria y la condición o daño que sufriera la señora Cirino Vizcarrondo. *Medina Santiago v. Vélez*, ante.

IV

*Una observación final.* Aun cuando el tribunal de instancia así no lo hizo constar de manera expresa en la sentencia que emitiera en el presente caso, *resulta patente que el resultado erróneo al que llegó en la misma fundamentalmente está basado en el testimonio pericial de un testigo que presentara la parte demandante, el ginecólogo obstetra Luis Baldera Quezada, el cual es oriundo de la República Dominicana y que expresamente vino a Puerto Rico con el*

*propósito de testificar en el presente caso.* El testimonio de este segundo testigo perito de la parte demandante no sólo fue contradicho por los peritos médicos que presentara la parte demandada —doctores Capella y Montilla— sino que, inclusive, su testimonio resultó, en ocasiones, contrario al testimonio del otro testigo perito de la parte demandante, el Dr. Rehuel Rivera.

Estamos *plenamente conscientes* de que dicha situación —esto es, la utilización de peritos provenientes de países extranjeros por parte de los demandantes en casos de impericia médica— es el producto, o consecuencia, de la *indiscutible dificultad* que tienen los ciudadanos que interesan demandar en nuestros tribunales a facultativos médicos e instituciones hospitalarias para obtener los servicios de peritos médicos residentes en Puerto Rico que declaren "en contra" de este tipo de demandados; dificultad que, obviamente, se debe a la *reticencia* que tienen estos profesionales de la salud de declarar contra compañeros médicos y contra las instituciones hospitalarias donde practican su profesión. Dicha innegable situación, sin embargo, *en nuestra opinión no justifica el uso indiscriminado de "peritos" de dudosa competencia profesional;* provenientes los mismos de países extranjeros —en algunos de los cuales, inclusive, se practica una medicina de calidad inferior a la practicada en Puerto Rico— que vienen a nuestra jurisdicción a prestar testimonio altamente cuestionable, a cambio de unos jugosos honorarios, en casos inmeritorios de alegada impericia médica.

La situación, no hay duda, es una *preocupante* que requiere *seria atención* y, sobre todo, *acción positiva, enérgica y creativa* no sólo por parte del foro judicial sino que de las clases médica y togada; ello en busca de una *solución justa y razonable* para dos intereses genuinos y legítimos que se encuentran en un aparentemente inevitable curso de colisión. *De un lado*, el derecho innegable de nuestros conciudadanos a ser *indemnizados adecuadamente* por los da-

ños sufridos como consecuencia de un acto de impericia médica cometido por un médico cuyos compañeros de profesión se niegan a testificar en su contra, no obstante estar convencidos de que efectivamente se incurrió en un acto de mala práctica profesional. *Por otro lado,* una clase médica puertorriqueña —que actualmente practica la medicina en forma "defensiva" debido, principalmente, a la *amenaza constante* de ser demandada viciosamente— cuya bien ganada reputación profesional está constantemente en peligro de ser destruida como consecuencia del testimonio irresponsable de unos médicos extranjeros, que están en disposición de testificar en casos inmeritorios, y, que así actúan posiblemente debido a que están conscientes del hecho de que su reputación no se verá afectada por cuanto su testimonio no será del conocimiento de persona alguna en su país de origen.

No debe olvidarse que las consecuencias de la radicación de pleitos inmeritorios por alegada mala práctica de la medicina lo constituyen, entre otras: la "práctica defensiva de la medicina", esto es, la realización de exámenes y análisis superfluos a los pacientes; la pérdida de valioso tiempo por parte de los médicos; los gastos legales innecesarios en que éstos se ven obligados a incurrir, y el alza desmedida en las primas que pagan los médicos y hospitales por los seguros de impericia médica.[23] *La consecuencia inevitable de todo ello lo es el encarecimiento de los servicios médicos que se prestan en Puerto Rico.*

Todas las partes envueltas en este delicado asunto tienen que realizar un esfuerzo máximo por alcanzar *un fino balance* de intereses. *La clase médica tiene que tomar car-*

---

[23] Tomamos conocimiento judicial del hecho de que actualmente la Asamblea Legislativa de Puerto Rico precisamente tiene bajo estudio y consideración la situación del alza de, o recargo en, las primas que pagan los médicos por dicho seguro por razón de lo que se denomina "experiencias adversas" en su práctica de la medicina. *Esto es, el mero hecho de ser demandado un médico causa un aumento en las primas que éste paga, no importando si la demanda radicada posteriormente es declarada sin lugar.* Véase edición de 30 de agosto de 1991 del Periódico *El Nuevo Día,* pág. 16.

*tas en el asunto.* Debe claramente entender que cuando uno de sus miembros, en el descargo responsable de su profesión, testifica en un tribunal de justicia contra un médico incompetente que ha incurrido en un claro acto de impericia médica que ha causado daños, dicho profesional de la salud no incurre en un acto de deslealtad o falta de compañerismo; *todo lo contrario, ese galeno que sirve como perito médico en un caso genuino de mala práctica de la medicina le está haciendo un gran servicio a su profesión y a Puerto Rico: está ayudando a liberar a nuestra comunidad de médicos incompetentes.*

Por otro lado, no hay duda que la *clase togada puertorriqueña* desempeña un rol vital en este asunto y puede ser de gran ayuda en su solución; *ésta puede, y debe, evitar a toda costa la consciente radicación de acciones viciosas por impericia médica.* El abogado, antes de radicar en los tribunales una acción por mala práctica de la medicina, *debe ilustrarse al respecto,* ya mediante la consulta con un médico local, o del exterior, que verdaderamente sea competente, ya mediante la lectura de libros de texto de medicina; *de esa forma asegurándose, hasta donde ello sea posible y factible, que cuenta con un caso meritorio de impericia médica.* En otras palabras, todo abogado que, en representación de su cliente, radique una demanda de daños y perjuicios por mala práctica de la medicina *deberá* estar en posición, de ser requerido para ello por el tribunal, de demostrar el fundamento médico jurídico en el cual descansa o basa su reclamación a los efectos de que la parte demandada incurrió en la impericia médica alegada. *Los tribunales de instancia deberán estar particularmente atentos a esta situación en temprana etapa del procedimiento incoado, no debiendo vacilar en desestimar aquellas demandas infundadas que nunca debieron ser radicadas; ello con la correspondiente imposición de honorarios de abogado por razón de temeridad.* A esos efectos, véase *Cor-*

*pak, Art Printing v. Ramallo Brothers*, 125 D.P.R. 724 (1990).

En relación con lo antes expuesto, *procede que nos preguntemos si en nuestra jurisdicción resulta indispensable que en todas las ocasiones en que se radica una demanda por alegada mala práctica de la medicina se contrate un médico con el propósito de que éste testifique en el caso a los efectos de sostener la referida alegación.* La *contestación* en la *negativa* —esto es, de que ello no resulta ser indispensable en todos los casos— la encontramos en las disposiciones de la Regla 65(R) de Evidencia de 1979, la cual, en lo pertinente, dispone que:

> Es admisible como excepción a la regla de prueba de referencia aunque el declarante esté disponible como testigo:
>
> (R) *Tratados:*
>
> Declaraciones contenidas en un tratado, revista o folleto, u otra publicación similar, sobre un tema histórico, médico, científico, técnico o artístico siempre que se establezca, mediante conocimiento judicial o testimonio pericial, que la publicación constituye una autoridad confiable sobre el asunto. 32 L.P.R.A. Ap. IV.

En relación con dicha disposición reglamentaria, expresa el profesor Chiesa,[24] en lo pertinente, que:

> Aunque no se cuestiona que las declaraciones contenidas en los tratados son, para ciertos fines y con algunas limitaciones, admisibles en evidencia, *dichos fines y limitaciones sí son objeto de grandes debates.* La *regla mayoritaria,* aunque objeto de severa crítica, *sigue siendo que los tratados no son admisibles como evidencia sustantiva* aunque sí son admisibles a los fines de impugnación de testimonio pericial. *La regla minoritaria —que es la adoptada en este inciso— sostiene que las declaraciones contenidas en este tipo de obras son admisibles como excepción a la regla de prueba de referencia.* Tal excepción se justifica por la *imparcialidad inherente* a una obra escrita básicamente para profesionales o con fines docentes. Otro *fac-*

[24] E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia*, San Juan, Pubs. J.T.S., 1983, Vol. I, Cap. VIII, págs. 430–431.

*tor de gran confiabilidad* es que estando dichas obras sujetas al juicio crítico de las autoridades en la materia, la reputación y el prestigio del autor están en juego, *lo que hace improbable que éste no se preocupe por que todo lo que escribe sea, en la medida de lo posible, correcto o exacto.*

Pero, por otro lado, independientemente de la confiabilidad de la obra, *existe la posibilidad —para algunos la probabilidad— de que la obra sea "malentendida" en ausencia de ayuda pericial; al menos se cree que, sin la ayuda pericial, es probable que las afirmaciones contenidas en el tratado sean erróneamente aplicadas a los hechos.* De ahí que *la regla federal 803(18) limita el uso de tratados como evidencia sustantiva a situaciones en las que un perito está testificando;* ello garantiza la disponibilidad del perito para contestar preguntas en cuanto al significado o aplicación del contenido del tratado. Por las mismas razones, se dispone en la regla federal que, de ser admisibles, las declaraciones pueden ser leídas en evidencia pero no pueden ser recibidas como *exhibits.*

*Nuestra regla no tiene estas limitaciones. Podemos hacer conjeturas sobre el porqué de una regla tan liberal.*

En primer lugar, de ordinario los costos del peritaje resultan considerables. Una parte puede tener un buen caso pero no contar con recursos suficientes para contratar un perito. Un abogado, bien preparado y con la ayuda de un buen tratado, podría establecer su caso a través de declaraciones contenidas en la obra, sin necesidad de perito. *El tribunal siempre puede nombrar sus propios peritos para asegurarse de la comprensión más cabal del asunto.* En segundo término, la limitación de que no se admita la obra en evidencia es contraria a la realidad de lo que ocurre fuera de la sala. El juez, por su cuenta, consulta los tratados, estén o no éstos admitidos en evidencia.

El uso de tratados es crucial para el contrainterrogatorio de peritos. El abogado que no cuenta con un perito, cuando se enfrenta al perito de la parte contraria, descansa básicamente en el uso de tratados para contrainterrogar eficazmente al perito. Sin embargo, existe una regla restrictiva en virtud de la cual, para contrainterrogar a un perito por medio de un tratado, el perito debe haber expresamente descansado en dicho tratado en su examen directo. *La regla liberal permite el uso de tratados para contrainterrogar a un perito independientemente de que éste hiciera referencia a dicho tratado en el examen directo, siempre que se establezca que la obra constituye una autoridad confiable sobre el asunto en controversia. Este es el enfoque de nuestra regla.* Sobre este asunto, véanse Annot. 60 A.L.R. 2d

77, y *Reilly v. Pinkus*, 338 U.S. 269 (1949), y *McCormick*, Sec. 321.

> *En suma, nuestra regla es completamente liberal. En primer lugar, se admiten como evidencia sustantiva las declaraciones contenidas en tratados aunque no esté declarando como perito testigo alguno. Y en segundo lugar, a los fines del uso del tratado cuando declara un perito, no se requiere que éste se refiera al tratado en su examen directo, ni que haya sido contrainterrogado a base de declaraciones en el tratado.* Bajo nuestra ley anterior eran admisibles en evidencia las obras históricas, libros de ciencia y artes, y mapas o cartas publicados, cuyos autores nada tuvieren que ver con las partes, como evidencia prima facie respecto a hechos de general notoriedad e interés. 32 L.P.R.A. sec. 1827. (Énfasis en el original suprimido y énfasis suplido.)

Como correctamente expresa el profesor Chiesa, la terminología en que está concebida la citada Regla 65(R) de Evidencia significa que, en relación con esta materia, en Puerto Rico rige la llamada "regla minoritaria"; *esto es, en nuestra jurisdicción se permite la utilización del contenido de textos de medicina no sólo en el contrainterrogatorio de los peritos médicos de la otra parte sino que, y aún más importante, dicho contenido es admisible en evidencia como prueba sustantiva, aun cuando no se presente como testigo a perito alguno.*

La referida disposición reglamentaria permite que en nuestra jurisdicción, en innumerables casos de alegada mala práctica de la medicina, *los tribunales de instancia puedan determinar si se cometió o no la impericia médica alegada sin necesidad de perito alguno.* No hay duda, sin embargo, que en algunos casos dicha determinación judicial *no* es factible realizarla sin la ayuda de un perito médico. Por otro lado, tampoco debe haber duda de que en esta clase de casos el testimonio de un perito siempre resulta ser de innegable ayuda al tribunal, particularmente en la interpretación de récord médicos y, precisamente, en relación con la interpretación de libros de texto de medicina.

En esta clase de situaciones —esto es, en las cuales el testimonio del perito es indispensable y en aquellas en que el mismo resulta ser de gran ayuda— *las referidas Reglas de Evidencia de 1979 le proveen a los tribunales de instancia un valioso mecanismo que resulta ser de incalculable ayuda para el juzgador.* Como es sabido, *la Regla 59 de Evidencia*, 32 L.P.R.A. Ap. IV, faculta a los tribunales para nombrar *su "propio" perito.* La misma establece:

(A) *Nombramiento. Antes* del comienzo del juicio *o durante* el transcurso de éste, *cuando el tribunal determine que es necesaria prueba pericial, podrá de su propia iniciativa, o a solicitud de parte, nombrar uno o más peritos* para que investiguen y sometan un informe según lo ordene el tribunal, o *para que declaren en calidad pericial en el juicio.* El tribunal determinará *la compensación* por los servicios del perito.

(B) *Compensación.* En toda acción criminal o procedimiento de menores, la compensación será pagada con fondos del Estado. *En todas las demás acciones civiles, la compensación será pagada por las partes envueltas en el litigio en la proporción que el tribunal determine, sujeto a que luego sea impuesta como otras costas o desembolsos conforme a derecho.*

(C) *Presentación e interrogatorio.* Cualquier perito nombrado por el tribunal conforme a esta regla podrá ser llamado a declarar y ser interrogado por el tribunal o por cualquier parte. Cuando sea llamado e interrogado por el tribunal, las partes tendrán el mismo derecho a contrainterrogar como si se tratare de cualquier otro testigo.

(D) *Derecho a presentar otra evidencia pericial.* Esta regla *no impedirá que cualquier parte presente evidencia pericial adicional sobre el mismo hecho o asunto sobre el que declara o informa el perito nombrado por el tribunal.* Si la parte presenta su propio perito, pagará sus honorarios sin que dicho pago sea recobrable como costas, a menos que el tribunal discrecionalmente disponga lo contrario. (Énfasis suplido.) 32 L.P.R.A. Ap. IV, R. 59.

Como certeramente señalara este Tribunal en *San Lorenzo Trad. Inc. v. Hernández*, 114 D.P.R. 704, 711 (1983) —citando con aprobación a *Toppel v. Toppel*, 114 D.P.R. 16 (1983)— aun cuando las referidas Reglas de Evidencia de 1979 "permiten a cualesquiera [de las] partes presentar

*sua sponte* su propio perito, *siguiendo la orientación moderna persiguen estimular el nombramiento del 'perito judicial' designado por el tribunal"*; ello con el propósito y objetivo de " 'evitar y eliminar *la situación [indeseable]* de que los peritos sean o se conviertan en testigos particular de las partes ... *logrando que su comparecencia y testimonio ante el tribunal sea sin endoso previo a cualesquiera de los litigantes' "*. (Énfasis suplido.) Véase, en adición, *Urrutia v. A.A.A.*, 103 D.P.R. 643 (1975).

Si en alguna disciplina de la litigación civil se ha "degenerado" la práctica de contratar testigos peritos para que, a cambio de jugosos honorarios, incondicionalmente declaren a favor de la posición particular que en el caso sostiene la parte que lo contrata lo es en el campo de las demandas de daños y perjuicios por mala práctica de la medicina. *Dicha situación, la cual tiene el efecto de desorientar al tribunal en cuanto a cuál es la realidad de lo ocurrido, adquiere ribetes trágicos en la práctica de contratar peritos provenientes del extranjero los cuales, como expresáramos anteriormente, puede no importarles el contenido de su declaración por razón de que su reputación profesional no sufrirá ya que nadie se enterará del mismo en su país de origen.*

Los tribunales de instancia, naturalmente, *no* tienen la facultad para evitar o prohibir que una parte presente su propio perito médico, el cual puede provenir de cualquier parte del mundo. *Ello no obstante, y mientras ello sea factible, deben constatar no sólo las credenciales profesionales de dichos peritos sino la corrección médica del testimonio pericial que éstos prestan mediante la consulta de libros de texto apropiados de medicina y mediante la designación de "peritos del tribunal"*, esto es, mediante la utilización al máximo de las disposiciones de la antes citada Regla 59 de Evidencia.

Su acción a esos efectos resultará, a nuestro juicio, en la emisión de sentencias jurídicamente correctas en esta

clase de casos; *ello no sólo en beneficio de los litigantes en particular, sino que en beneficio de la ciudadanía en general.*

Por todas las razones antes expuestas, es que concurrimos con la sentencia que hoy emite el Tribunal en el presente caso.

$$-\ O\ -$$

Opinión disidente del Juez Asociado Señor Negrón García.

Discrepamos. "No es lo mismo 'interpretar' un *texto* jurídico, que 'interpretar' jurídicamente una situación de *hecho*. En el *primer caso*, se trata de hallar una norma a partir del texto que la expresa: la norma es el contenido de significación —ya sea un precepto general, ya sea uno individualizado— correspondiente a ese texto. En el *segundo caso*, en cambio, se trata de saber si se dan en efecto las circunstancias de hecho que hacen que tal o cual norma (que se supone ya perfectamente conocida de antemano) sea aplicable: ver si son idénticas las circunstancias (conocidas) previstas en el supuesto de la norma, que las circunstancias (que se indagan) verificadas de hecho en la situación realmente producida. Este segundo caso, pues, da por supuesto la previa resolución del primero: aquél viene a cobrar sentido jurídico, sólo a la luz de lo preestablecido en éste." (Énfasis en el original.) E.P. Haba, *Esquemas metodológicos en la interpretación del derecho escrito*, 50 Rev. Fac. Der. Venezuela 125, 125-126 (1971). La única solución jurídica compatible con la prueba y con los hechos desfilados es que los daños sufridos por la demandante Ada Cirino Vizcarrondo provinieron de la *negligencia* combinada —en mayor y menor grado— de los demandados, Manuel Pita Tovar (ginecólogo obstetra) Raúl Justiniano (ci-

rujano) y el Hospital Gubern.([1]) Y es que en los "casos de daños por negligencia médico-hospitalaria rige en nuestra jurisdicción una norma de consenso, muro de contención y contrapeso a la gama de intereses diversos y encontrados que suscita toda acción de esta naturaleza. '[L]a aplicación del estándar de prueba en la relación causal: [no implica] ni excesiva rigidez que impida probar una reclamación válida por la imprudencia profesional del médico o la deficiente atención hospitalaria, ni la laxitud que abre las puertas a la especulación y a la conjetura'. *López* v. *Hosp. Presbiteriano, Inc.*, 107 D.P.R. 197, 223 (1978)". *Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721, 724 (1984).

I

Las circunstancias fácticas que sirven de trasfondo a la justa sentencia emitida por el Tribunal Superior, Sala de Humacao (Hon. Carlos de J. Rivera Marrero, Juez), se inician el 1ro de octubre de 1980 cuando Ada ingresa al Hospital Gubern —en Fajardo— para dar a luz su segundo hijo mediante una operación *selectiva* de cesárea. Fue hospitalizada al cuidado del doctor Pita Tovar, quien le había estado brindando tratamiento *pre parto* durante nueve (9) meses. Al día siguiente dio a luz una niña mediante cesárea sin ninguna otra aparente complicación. El 6 de octubre fue dada de alta en buen estado y regresó con la niña a su casa con instrucciones de volver el 9 para que le cortasen los puntos de sutura. Ese día acudió a la oficina del

---

[1] Por los demandantes prestó testimonio Ada Cirino, su madre Evangelina Vizcarrondo, sus cuatro (4) hermanos, su esposo y su padre. Además, declararon el Dr. Rehuel Rivera —quien participó en la laparotomía exploratoria que se le realizó a Ada en el Centro Médico— el perito Dr. Luis Baldera Quezada, obstetra y ginecólogo cuya práctica realiza en la vecina República Dominicana.

La prueba de los demandados consistió de los propios demandados Manuel Pita Tovar y Raúl Justiniano; de los peritos Dres. Amaury Capella (cirujano) y Fernando J. Montilla (ginecólogo obstetra). Fueron admitidos en evidencia los originales de los récord médicos del Hospital Gubern, de la Sala de Emergencia del Doctor's Hospital de Santurce y del Centro Médico.

doctor Pita Tovar y le fueron removidos sin problema. Sin embargo, al día siguiente retornó porque uno de los puntos estaba supurando. Se le drenó un pequeño absceso, se le brindó tratamiento local, se le recetó *Principen* (antibiótico) y un antiinflamatorio y, además, se le instruyó que regresara si no se curaba.

El 16 de octubre Ada fue al Hospital Gubern a las 10:00 A.M., con dolor en el epigastrio-abdomen, el cual se le había manifestado esa madrugada. Antes no había sentido dolencia alguna. Fue ingresada y el doctor Pita Tovar refirió una consulta con el cirujano Dr. Raúl Justiniano. Los análisis de laboratorio reflejaron las amilasas séricas "ligeramente elevadas" y los glóbulos blancos "no mostraban señales de infección". Como diagnósticos probables el doctor Justiniano consideró colecistitis, apendicitis, *pancreatitis, absceso intraabdominal* o embolismo pulmonar. Optó por diagnosticar *pancreatitis* y ordenó el tratamiento correspondiente. Posteriormente, ante los otros posibles diagnósticos y ante la ausencia de facilidades del hospital y la condición física *grave* de Ada, le comunicó al doctor Pita Tovar la necesidad de trasladarla a otro hospital con facilidades adecuadas. Informados los familiares, luego de unas gestiones hechas por el doctor Pita Tovar, llegó en ambulancia privada el 17 de octubre a las 6:45 P.M. al Doctor's Hospital con un diagnóstico de pancreatitis *aguda*. No fue admitida allí, y a las 8:40 A.M. fue referida y admitida en el Centro Médico de San Juan. A su arribo padecía de "shock séptico" y presentaba dificultad para respirar. Fue colocada inmediatamente en un respirador mecánico. Después de varias consultas con especialistas, el 21 de octubre se le practicó con éxito una laparotomía exploratoria. El 26 de noviembre fue dada de alta y regresó a su hogar.

La odisea de Ada y la falta de cuidado médico (*malpractice*) la sintetiza así el tribunal de instancia:

Finalmente haciendo un resumen de los hechos determinamos que la responsabilidad por los daños sufridos por la demandante Ada Cirino surge de la mala práctica incurrida por los Doctores Manuel Pita Tovar, al intervenir quirúrgicamente en una operación de cesárea, teniendo ante sí a una persona obesa, difícil de manejar quirúrgicamente, al extremo de que fue la primera vez que operaba subido a un banquillo o taburete, casi sin alcanzar a la paciente (según su propio testimonio). En la incomodidad de esta operación el Dr. Pita Tovar *hizo un punto en el omentum de la paciente, el cual necrosó, contaminando la cavidad abdominal de la Sra. Cirino, lo que dio lugar a una infección con abscesos intra-abdominales múltiples.* Según el testimonio del Dr. Amaury Capella estas infecciones no tienen un término de tiempo en desarrollarse pudiendo desarrollarse de tres a cuatro semanas igual que de cuatro a cinco días. La complicación debido a la mala práctica del Dr. Pita Tovar en su intervención de cesárea, conduce casi a la muerte de la Sra. Ada Cirino. Como hombre prudente, precavido y razonable el Dr. Pita Tovar no tomó ninguna medida especial en la preparación de la operación de cesárea a la paciente Ada Cirino, *conociendo con suficiente tiempo su condición de obesidad previa, así como que tenía que minimizar los riesgos en la sala de operaciones por esta condición.*

Luego de recibir el día 16 de octubre de 1980 a la paciente Ada Cirino en condición de cuidado, no grave, el Dr. Pita Tovar incurre en *otro acto negligente al hacer un diagnóstico equivocado. No realizó las pruebas necesarias para llegar a un diagnóstico correcto,* por lo que finalmente y para quitarse el problema de encima diagn[o]stic la enfermedad de Ada Cirino como *pancreatitis aguda.* Ese mismo día consultó al Doctor Justiniano el cual incluye muchas posibilidades pero *no hace ningún esfuerzo por hacer un diagnóstico diferencial adecuado.* Es sabido la importancia, y así lo ha reconocido nuestro Honorable Tribunal Supremo de la *obligación de tomar los signos vitales.* El Doctor Pita como el Dr. Justiniano en ningún momento se preocuparon por exigirle al hospital de la Clínica Gubern a que siguiera las órdenes por ellos impartidas de tomar los signos vitales a intervalos. La importancia de estos signos vitales *era determinar el desarrollo del cuadro clínico de la paciente.*

Luego el Dr. Justiniano, debido a que tiene compromisos fuera del país, y el Dr. Pita se reúnen, y determinan que hay que trasladar a la paciente. *En este momento su condición era de gravedad.* Se lo informan a su señora madre, Evangelina Vizcarrondo, quien toma la decisión. El Dr. Pita hace las gestiones en el Hospital Auxilio Mutuo y Docto[r's] Hospital sin conocer

las facilidades de que gozan estos hospitales para el trata-
miento de las complicaciones de Ada Cirino. Le dan la opción a
la señora madre de Ada Cirino de escoger entre estos dos hos-
pitales, la señora escoge el Docto[r's] Hospital. A las 4:45, en
estado de suma gravedad, es trasladada Ada Cirino al
Docto[r's] Hospital. Las gestiones de ambulancia las tiene que
hacer su señora madre y *se envía sin ayuda médica de clase
alguna*, actuación claramente negligente de los Doctores Pita y
Justiniano. Llega Ada Cirino al borde de la muerte al Docto[r's]
Hospital, *por lo que no es aceptada por el médico de emergencia*,
quien ordena se le tomen allí los signos vitales y le administra
un *suero salino y oxígeno para tratar de ayudarla y que man-
tuviera el hilo de vida que le quedaba hasta llegar al Centro
Médico*. Llega al Centro Médico con un "shock" séptico y dificul-
tades al respirar. Allí no se le puede operar inmediatamente por
causa del problema respiratorio. Primordialmente antes de
operarla había que *estabilizar su condición respiratoria* porque
de haberse operado en aquel momento las probabilidades de
vida de Ada Cirino hubiesen sido [í]nfimas. Luego de estabilizar
a la paciente de su problema principal respiratorio, secundario
a la infección intra-abdominal sufrida por ella, es operada. *Se-
gún testimonio de uno de los cirujanos que estuvo presente allí,
el Doctor Rivera expresó que todo el problema de Ada Cirino se
debió a que se le dió un punto en el omentum el cual necrosó, y
junto con la contaminación de la operación de cesárea efectuada
por el Dr. Pita, crearon los abscesos intra-abdominales*. La Sra.
Cirino pasa allí una larga y dolorosa recuperación y finalmente
es dada de alta el 26 de noviembre de 1980 no sin antes tener la
caída de su pelo (alopesia) y sufrir grandes dolores físicos y
mentales. Finalmente es tratada por la Clínica externa por lo
cual se dan de cuatro a seis citas médicas adicionales y final-
mente es dada de alta el mes de enero a febrero de 1981. Sus
familiares al ver la pobre condición de Ada Cirino sufrieron las
angustias mentales descritas más adelante. (Énfasis suplido.)
Apéndice, págs. 36–39.

No obstante estas claras determinaciones formuladas
por el tribunal de instancia, hoy la mayoría las sustituye y
rechaza. Aunque sin expresarlo, descansan en la conocida
regla de que en la evaluación pericial estamos, como foro
apelativo, en la misma posición que el tribunal de origen,
por lo que no se aplica la tradicional norma de deferencia.

## II

La sentencia mayoritaria necesariamente ha tenido que acoger la tesis de que la sutura del "omentum o epiplón" de Ada durante la operación cesárea que realizó el doctor Pita Tovar no constituyó negligencia. El fundamento para esa conclusión únicamente puede ser que no se demostró que el obstetra Pita Tovar lo suturara, que ello no constituyera impericia médica y, por último, que la opinión de los peritos de los codemandados fue a los efectos de que la sutura nunca podía ser per se la causa de una infección en el abdomen de una persona. En realidad, la mayoría adopta el criterio de la opinión concurrente suscrita por el Juez Asociado Señor Rebollo López, que se hace eco del testimonio del doctor Capella, expositivo de que la infección y los abscesos intraabdominales se desarrollaron porque se trataba de una paciente obesa y que algunas bacterias pudieron pasar del medio ambiente a través de la matriz y de las trompas de falopio. Opinión concurrente, págs. 991–992. Otra vez estamos ante la cuestionable tesis judicial de una complicación inevitable.[2] Se trata de una postura que recientemente ha encontrado eco en este Tribunal y que debilita la norma sobre excelencia médica. *Núñez Martínez v. Martínez Rosado*, 129 D.P.R. 371 (1991), voto disidente.

Es un hecho no contradicho que Ada desarrolló un absceso intraabdominal en el "omento o epiplón", que al romperse se diseminó en el abdomen y provocó la formación de múltiples abscesos y pus libre. En palabras del cirujano doctor Rivera,[3] esa fue *la impresión* de los galenos que estuvieron en la laparotomía. Se trata de una apreciación directa respaldada por los hallazgos descritos en el informe

---

[2] T.E. de 14 de febrero de 1986, págs. 11, 42 y 43.

[3] T.E. de 11 de febrero de 1986, pág. 37.

del doctor Alcaraz,([4]) cirujano *principal* de la laparotomía practicada el 21 de octubre de 1980.

Para superar estas realidades, la opinión concurrente por vía del escolio once (11) pone en duda la veracidad del doctor Rivera a base de que a la fecha del juicio tenía constituida una sociedad profesional con el hermano del abogado de Ada. Realmente nos preocupa el valor, si alguno, que ello pudiera tener en la razón de decidir mayoritaria. Una cosa es cierta: el doctor Rivera intervino en la laparotomía en una etapa en que no existía esa sociedad profesional y su testimonio fue *contundente*.

La opinión concurrente, además, resalta la contestación del doctor Rivera al preguntársele la posibilidad de que la formación de los abscesos abdominales se debiera a un trauma técnico en el omento durante la cesárea, en el sentido de que "yo no estuve en esa operación original, eso es una posibilidad". T.E. de 11 de febrero de 1986, pág. 38. En su profundo valor probatorio, esa contestación no tiene el alcance restrictivo que se le adjudica de simplemente "una mera 'posibilidad' ". Opinión concurrente, pág. 990. Refleja un juicio sincero de un profesional honesto. Nos explicamos.

El doctor Rivera insistentemente aclaró en varias ocasiones que su comparecencia no era en calidad de perito de la parte demandante, sino como perito de *ocurrencia*. T.E. de 11 de febrero de 1986, pág. 102. "Es cuestión de que yo no me presto a ser perito como tal. Si yo intervengo con un paciente y yo tengo que decir en una corte la intervención mía, o lo que hay en el r[é]cord, verdad, expresarlo; eso es una cosa a uno prestarse a ser perito. De testificar en contra de un compañero por dos o tres dólares, *pues yo no me presto a eso*". (Énfasis suplido.) Íd. Esas aclaraciones, más

---

([4]) En el informe de la laparotomía exploratoria, el doctor Alcaraz apuntó lo siguiente: dos mil (2,000) cc. de pus libre, múltiples laceraciones, absceso peripectal y abscesos sufrénicos, y absceso *bien formado con una pared y cavidad definida en el omento mayor con perforación.*

bien defensivas, reflejan que estamos ante la dinámica peculiar de la presión que se ejerce sobre la clase médica, aun en aquellos que son testigos peritos de ocurrencia. *San Lorenzo Trad., Inc. v. Hernández*, 114 D.P.R. 704 (1983). Nos referimos a la llamada *conspiración del silencio* que como fenómeno existe entre las distintas clases profesionales (abogados, médicos, ingenieros, etc.). Bajo la misma, un segmento de la profesión médica censura al galeno que declara en casos de impericia médica contra su compañero. Visto desde esta perspectiva, la calificación de "posibilidad" afirmada por el doctor Rivera sobre la causa que produjo el absceso en el "omento o epiplón", entraña una dimensión más amplia y distinta. Dicha posición contrasta con el testimonio de los peritos de los demandados que, lejos de ser claros y categóricos, fueron más bien preconcebidos y acomodaticios.

El "omento o epiplón" es una capa de grasa que cubre el abdomen. En el contrainterrogatorio del doctor Rivera, el abogado de los demandados dedicó numerosas preguntas para tratar de establecer que en una intervención quirúrgica la probabilidad de infecciones es mayor en áreas en que se encuentran tejidos grasos. De igual forma, el doctor Capella atestó que "[s]abemos también que el paciente obeso es más propenso a infecciones de toda índole". T.E. de 14 de febrero de 1986, pág. 15.

Es una realidad innegable que Ada era una persona muy *obesa*. Pero esa característica, lejos de constituir un dato para eximir de responsabilidad al doctor Pita Tovar, se convierte precisamente en el *elemento crucial* para sostener todo lo contrario. Según la premisa del doctor Capella —a mayor acumulación de tejido graso, mayor probabilidad de infección— el doctor Pita Tovar no tomó ninguna medida o precaución especial al momento de realizar la cesárea aun cuando conocía anticipadamente de esa obesidad. La operación la realizó bajo circunstancias poco favorables. Según su propio testimonio, era la primera vez

que operaba subido en un banquillo o taburete, casi sin alcanzar a la paciente.

Ante esas circunstancias, ¿no es más probable y razonable concluir que el doctor Pita Tovar, por equivocación, dio un punto de sutura en el "omento o epiplón" de Ada? Esa fue la conclusión del ilustrado tribunal de instancia con apoyo en la prueba. Está avalada en el testimonio del doctor Rivera, en los hallazgos del informe sobre la operación que hiciera el doctor Alcaraz y en la opinión de *todos* los que estuvieron presentes en la *segunda* operación. *Todos concuerdan en que la condición de Ada tuvo su génesis en un absceso que se desarrolló en el "omento o epiplón".* La mayoría del tribunal descarta toda esta prueba, incluso la opinión concurrente llega al extremo de afirmar que no constituye impericia médica suturar el "omento o epiplón" durante una operación cesárea. Opinión concurrente, pág. 989. Además, adopta la opinión de que dicha sutura *nunca* puede ser per se la causa de una infección. Opinión concurrente, pág. 991.

No comprendemos esos asertos. *Primero*, aunque el doctor Capella atestó que a veces "a propósito" se sutura el epiplón, nada hay en la prueba de que *aquí* ese fuera el caso. Y *segundo*, si el "omento o epiplón" es un tejido graso más propenso a desarrollar infecciones en el transcurso de una intervención quirúrgica, ¿por qué no se tomaron unas medidas cautelares? En el contrainterrogatorio, el doctor Capella admitió que una sutura en el omento podía causar que esa parte perdiera circulación —se necrose— y que en presencia de bacterias creara una infección que produjera los abscesos intraabdominales en el omento. T.E. de 7 de marzo de 1986, pág. 146. *Así le ocurrió a la paciente Ada.*

No debe haber duda. Con mayor probabilidad la formación del absceso en el omento o epiplón fue causado por el punto de sutura *unido* a las bacterias provenientes del medio ambiente. *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719, 745 (1983).

## III

La doctrina de que un médico no es responsable por el mero hecho de que haga un diagnóstico equivocado, esto es, que puede haber errores razonables de juicio, no aplica al caso de autos. El criterio de razonabilidad *presupone que el médico efectúe todos los exámenes necesarios para llegar a un diagnóstico concreto.* Tiene el deber de hacer un esfuerzo honesto y concienzudo para enterarse de los síntomas y de la condición del paciente. *Morales v. Hosp. Matilde Brenes,* 102 D.P.R. 188 (1974). No podemos, pues, coincidir con la conclusión genérica mayoritaria de que el diagnóstico de los doctores Pita Tovar y Justiniano no genera responsabilidad.

Según reseñado, la prueba estableció que el 16 de octubre Ada fue ingresada en el Hospital Gubern con un "cuadro" de dolor agudo en el epigastrio. Fue atendida por el doctor Pita Tovar y luego por el doctor Justiniano. Éstos se limitaron a realizar pruebas mínimas. Como consecuencia, arribaron a un diagnóstico equivocado de *pancreatitis;* es decir, descansaron en una prueba que indicó una *leve elevación de amilasas,* lo cual no era suficiente para sostener el diagnóstico de pancreatitis[6] frente al cuadro grave físico que presentaba. Sobre este aspecto, el testimonio del doctor Capella indicó que la buena práctica de la medicina requería que se realizara un examen rectal "adecuado". T.E. de 14 de febrero de 1986, pág. 76. Ciertamente el rea-

---

[6] Testimonio del doctor Rivera (T.E. de 11 de febrero de 1986, págs. 30, 35, 102 y 103). Del testimonio del doctor Capella transcribimos:

"P. Doctor, viendo la amilasa se[rí]ca que dio 315;..

"R. Correcto.

"P. Y el cuadro ... ¿qué clase de pancreatitis podría tener ella con ese contaje?

"R. Una pancreatitis *breve.*

"P. ¿Era compatible con el cuadro que presentaba la paciente, doctor?

"R. Podría ser en cuanto al dolor que presentaba porque no siempre el grado de inflamación va con la parte subjetiva del dolor pero no es el tipo de amilasa, *no es la elevación que uno esperaría en una pancreatitis severa.*" (Énfasis suplido.) T.E. de 7 de marzo de 1986, pág. 84.

lizado por el doctor Pita Tovar, quien se limitó a anotar que fue *"doloroso" sin otra descripción, no lo fue.* Íd. Por otro lado, se estableció que una prueba de amilasa en orina era más *específica* para descartar una pancreatitis *cuando la amilasa normal no excluía ese diagnóstico.* T.E. de 7 de marzo de 1986, pág. 85. Tales pruebas, como concluyó el tribunal, pudieron haber sido realizadas en las facilidades existentes en el Hospital Gubern en 1980 y no fueron hechas *adecuadamente.*

Ada no mejoró con el tratamiento ofrecido en el Hospital Gubern durante las treinta y tres (33) horas que allí estuvo; *por el contrario, rápidamente su condición física se deterioró.* Al momento de ser transferida al Doctor's Hospital estaba muy delicada, con dificultad respiratoria y ansiedad. Sabido es que la aplicación de uno u otro tratamiento depende principalmente de la realización del diagnóstico adecuado a cada caso particular. Un diagnóstico equivocado conduce irremediablemente a ofrecer un tratamiento *igualmente erróneo.* La condición de Ada, diagnosticada como *pancreatitis aguda,* recibió tratamiento. El diagnóstico realizado negligentemente y, por ende, el tratamiento ofrecido agravó su condición. El problema respiratorio y el estado crítico que para el 17 de octubre sufría fue secundario; esto es, fue consecuencia del desarrollo de los abscesos y de la infección en el abdomen. Testimonio del doctor Rivera (T.E. de 11 de febrero de 1986, pág. 48). Estamos ante un caso claro de *"omisión de diagnóstico apropiado* que da margen a responsabilidad profesional". (Énfasis en el original.) *Pérez Cruz v. Hosp. La Concepción,* supra, pág. 728.

Incurrieron, además, en una tardanza irrazonable en referirla a otro hospital. El síntoma de abdomen agudo fue un claro indicador de que Ada requería un manejo distinto al que le fue ofrecido en el hospital de Fajardo.[7] La ausen-

---

[7] Testimonio del doctor Rivera:

cia de facilidades para atenderla adecuadamente ameritaba mayor diligencia en la decisión de transferirla.

Como corolario, no obstante esa condición crítica, fue transportada en una ambulancia desde Fajardo hasta San Juan sin ninguna atención o cuidado médico. Aunque tenía dificultad respiratoria, no se le proveyó oxígeno durante el viaje. Es lamentable la demora y forma en que se produjo su traslado. Llegó al Centro Médico en "shock" séptico con dificultad para respirar. Tuvo que ser colocada en un respirador mecánico y no fue hasta cuatro (4) días después —normalizada la respiración— que pudo ser sometida a la operación que puso fin a su agonía.

Un médico no se libera de responsabilidad con el mero hecho de coordinar una ambulancia para transferir una paciente a otro hospital. Debe exigir unas condiciones mínimas de seguridad teniendo presente la condición peculiar del paciente y la atención necesaria. No nos explicamos cómo la mayoría puede concluir que no debe imponérsele responsabilidad a los médicos codemandados en vista de las condiciones desfavorables en que se hizo el viaje en ambulancia; obviamente ello afectó la condición principal que sufría la señora Cirino. La condición *principal* que afectó a Ada fue la infección y abscesos intraabdominales causados por la sutura del epiplón durante la operación cesárea de 2 de octubre de 1980. El atraso y las condiciones del viaje en ambulancia constituyó un acto *distinto* que *agravó* su condición general de deterioro.

---

"P. ¿ Y cuál es el manejo de un abdomen agudo, doctor?

"R. El único manejo es operarlo.

"P. ¿El único manejo?

"R. Es mi opinión, si es un abdomen agudo hay que operarlo." T.E. de 11 de febrero de 1986, pág. 45.

## V

Finalmente, la mayoría se equivoca al concluir que no existe justificación jurídica para responsabilizar al codemandado Hospital Gubern por la omisión de sus empleados, quienes no siguieron las órdenes de los médicos de tomar los signos vitales de la paciente; igualmente, al eximir de responsabilidad a los doctores Pita Tovar y Justiniano por no supervisar adecuadamente el cumplimiento de sus órdenes. Se trata de medidas sencillas que forma parte del *abecedario* rutinario de todo hospital.

*La sentencia mayoritaria no niega que esas omisiones ocurrieran;* tampoco que constituyera un quebrantamiento del deber del hospital y de los médicos de ofrecer a sus pacientes la atención que satisfaga las exigencias generalmente reconocidas por la profesión médica a la luz de los medios modernos de comunicación y enseñanza. Simplemente se apuntalan en que no existió prueba demostrativa de la relación causal entre esos hechos y la condición o daño sufrido por Ada.

Otra vez se entremezclan conceptos. No concebimos cómo puede concluirse que el único daño sufrido por Ada fueran los abscesos intraabdominales debido a "causas inevitables". El análisis integral de la prueba demostró un cuadro de sucesivos actos negligentes que colocaron a Ada en el umbral de la muerte. La omisión de los empleados del Hospital Gubern fue uno más en la cadena ininterrumpida de eventos.

No existe otro curso decisorio. Los doctores Pita Tovar y Justiniano son responsables por no cumplir con las normas mínimas de cuidado y atención de una paciente hospitalizada. Según expusimos en *Núñez v. Cintrón,* 115 D.P.R. 598, 615 (1984), la "responsabilidad de un médico con su paciente no queda adecuadamente descargada con meramente dejar unas órdenes a cargo de otros sin cerciorarse, de algún modo, que sean cumplidas. Una vez asume

la responsabilidad profesional, tiene el deber de diligentemente darle seguimiento y verificar si el hospital ha brindado el tratamiento prescrito a su paciente".

No podemos cerrar este disenso sin dejar plasmada nuestra gran preocupación por los pronunciamientos en la opinión concurrente sobre el problema de los peritos en estos casos. En particular, es inquietante aquel que tacha los " 'peritos' de dudosa competencia profesional; provenientes los mismos de países extranjeros —en algunos de los cuales, inclusive, se practica una medicina de calidad inferior a la practicada en Puerto Rico— que vienen a nuestra jurisdicción a prestar testimonio altamente cuestionable, a cambio de unos jugosos honorarios, en casos inmeritorios de alegada impericia médica". (Énfasis suprimido.) Opinión concurrente, pág. 998.

Por los fundamentos expuestos y por entender que las determinaciones del ilustrado tribunal de instancia son correctas, disentimos. *La buena práctica de la medicina no discrimina contra pacientes que están sobrepeso u obesos; tampoco debería hacerlo este Tribunal.*